THIS OPINION
IS A PRECEDENT OF THE
T.T.A.B.

Mailed:
January 16, 2008
jtw

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

In re ICE Futures U.S., Inc.[1]

_____

Serial No. 78199832,
Serial No. 78199843 and
Serial No. 78199848

_____

Karin Segall of Darby & Darby, P.C. for ICE Futures U.S.,
Inc.

Steven W. Jackson, Trademark Examining Attorney, Law Office
107 (J. Leslie Bishop, Managing Attorney).

_____

Before Walters, Walsh and Cataldo, Administrative Trademark
Judges.

Opinion by Walsh, Administrative Trademark Judge:

In an order mailed January 30, 2006, the Board

consolidated the proceedings in the appeals of the three

applications identified here because they involve the same

applicant and common issues of fact and law.

_____

[1] The Board of Trade of New York, Inc. filed the applications at
issue here. The Board of Trade of New York, Inc. assigned the
applications to Intercontinental Exchange, Inc., recorded at Reel
and Frame 3608/0080, on August 24, 2007. Intercontinental
Exchange, Inc. then assigned the applications to ICE Futures,
U.S., Inc., recorded at Reel and Frame 3635/0825, on October 9,
2007. All references to "applicant" include its predecessors.

In Application Serial No. 78199832, ICE Futures U.S., Inc. (applicant) has applied to register the mark SUGAR NO. 14 in standard-character form on the Principal Register for services identified as "financial services, namely, futures exchange and related commodity trading services" in International Class 36. Applicant claims both first use of the mark anywhere and first use of the mark in commerce on December 16, 1942.

In Application Serial No. 78199843, applicant has applied to register the mark SUGAR NO. 11 in standard-character form on the Principal Register identifying the same services and claiming the same dates of use as in the SUGAR NO. 14 application.

In Application Serial No. 78199848, applicant has applied to register the mark COTTON NO. 2 in standard-character form on the Principal Register again identifying the same services but claiming first use of the mark anywhere and first use of the mark in commerce in 1870.

In each of the three applications applicant has disclaimed the words "SUGAR" and "COTTON" respectively.

The Examining Attorney has finally refused registration on the Principal Register on two grounds in each of the three applications. First, the Examining Attorney has refused registration on the ground that each

2

of the marks merely describes the identified services under Trademark Act Section 2(e)(1), 15 U.S.C. § 1051(e)(1). Secondly, the Examining Attorney has refused registration on the ground that the marks/designations at issue do not function as service marks, that is, in each of the applications the specimens fail to show use of the respective marks as service marks in connection with the identified services under Trademark Act Sections 1, 2, 3 and 45, 15 U.S.C. §§ 1051, 1052, 1053 and 1127.

Applicant has appealed both refusals in all three applications. Applicant and the Examining Attorney have filed briefs. We reverse the refusals on both grounds in each of the three applications.

## The Descriptiveness Refusal

First, we address the descriptiveness refusal. A term is merely descriptive of services within the meaning of Section 2(e)(1) if it forthwith conveys an immediate idea of a quality, characteristic, feature, function, or purpose of the services. *See, e.g., In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009, 1009 (Fed. Cir. 1987); and *In re Abcor Development Corp.*, 588 F.2d 811, 200 USPQ 215, 217-18 (CCPA 1978). A term need not immediately convey an idea of each and every specific feature of the applicant's services in order to be considered merely descriptive; it is enough

3

that the term describes one significant attribute or function of the services. *See In re H.U.D.D.L.E.*, 216 USPQ 358, 359 (TTAB 1982); and *In re MBAssociates*, 180 USPQ 338, 339 (TTAB 1973).

We must determine whether a term is merely descriptive not in the abstract, but in relation to the services identified in the application and the possible significance that the term would have to the average purchaser of the services. *In re Polo International Inc.*, 51 USPQ2d 1061, 1062 (TTAB 1999); and *In re Bright-Crest, Ltd.*, 204 USPQ 591, 593 (TTAB 1979).

The Examining Attorney argues, "… the applicant's marks identify the commodity being traded through applicant's service… The wording SUGAR and COTTON identify the type of commodity that the applicant provides through the futures exchanges. The wording NO. 2, NO. 11 and NO. 14 identify the contract numbers for the cotton and sugar commodity that the applicant provides via its futures exchanges." Examining Attorney's Brief at 15. To support this conclusion, the Examining Attorney points to applicant's rules which specify contract terms relevant to the futures contracts covered by each of the marks and to other evidence likewise referencing these contract terms.

4

The contract terms include specifications for the product itself, quantity, delivery and other contract terms.

The Examining Attorney concludes his argument on this issue by stating:  "Furthermore, the proposed marks, by their very nature, must be available for use by all futures traders and any organization that reports out on futures trading."  *Id.* at 19.

Applicant begins its argument by explaining how it renders the identified services, that is, how a futures exchange operates.  This explanation is relevant to our consideration of both refusals at issue here.  Applicant states:

> The primary purpose of a futures exchange is price discovery.  Futures exchanges were created in response to the need for fair, orderly and efficient pricing of commodities in the marketplace.  The exchanges provide a regulated, public marketplace for investors to discover the price of a commodity by buying or selling futures contracts.  Investors profit or lose from the differences in the prices agreed upon when trading such contracts.  "A person seeking to liquidate his futures positions must form an opposite contract for the same quantity so that his obligations under the two contracts will offset each other."  (citation omitted.)  Generally, investors do not want to actually purchase or own the tangible commodity, such as sugar or cotton, being traded.  (citation and footnote omitted.)  In order to facilitate deal making, the futures exchanges, such as Applicant, created standardized futures contracts, so that the obligations of the contracts offset each other.  Thus the contracts are interchangeable and every term is the same except the price.

Applicant's Main Brief at 9-10.

Applicant elaborates further:

Investors cannot purchase SUGAR NO. 11 brand
sugar.  Investors cannot purchase a contract from
applicant.  That is not the way a futures
exchange operates.  Moreover, although in the
industry investors use the language "buying" and
"selling" with respect to trading futures
contracts, such contracts are not traded in the
sense that the same contract is bought and sold.
Rather, contracts are formed and discharged.
(citation omitted.)  Investors can and do
negotiate deals to buy or sell a tangible
commodity at certain price (sic) according to the
established rules and regulations set forth by
the SUGAR NO. 11, SUGAR NO. 14, or, COTTON NO. 2
contract terms.  Investors "trade", "buy" or
"sell" contracts from each other, not from
applicant.

*Id.* at 9.

With this background as a foundation, applicant argues
that the numerical elements in its marks are arbitrary.
Applicant states that, "There are over a hundred
commodities exchanges worldwide but none of them offers
services concerning the SUGAR NO. 11, SUGAR NO. 14 or
COTTON NO. 2 contracts, such services are exclusively
associated with Applicant."  *Id.* at 8, n.7.

As applicant argues, we see no evidence that "11,"
"14" or "2" have any particular meaning other than to
identify the futures contracts uniquely associated with
applicant.  As we indicated, applicant has disclaimed

"SUGAR" and "COTTON" in the respective applications. Also, there is no evidence that anyone other than applicant uses SUGAR NO. 11, SUGAR NO. 14 or COTTON NO. 2 in the rendering of the identified services descriptively or otherwise. There is no evidence that anyone in the relevant industry understands SUGAR NO. 11, SUGAR NO. 14 or COTTON NO. 2, in particular, the numerical elements, as having any industry-wide meaning.

While the full marks identify contracts with detailed, uniform terms, the record establishes that applicant created those terms for its exclusive use in the rendering of its services, that is, in the operation of a futures exchange.

In fact, the evidence of third-party references to SUGAR NO. 11, SUGAR NO. 14 or COTTON NO. 2 in varying forms shows a consistent, explicit association of the marks with applicant, usually referred to as "NYBOT," a reference to the New York Board of Trade, the predecessor owner. These references are drawn from reports of quotations and discussions regarding applicant and its activities. *See*, *e.g.*, evidence attached to the Office Action sent January 10, 2006 regarding SUGAR NO. 14 and evidence attached to the Office Action sent August 30, 2005 regarding COTTON NO. 2.

7

Accordingly, based on the evidence of record we conclude that SUGAR NO. 11, SUGAR NO. 14 and COTTON NO. 2, when viewed in their entireties and in the full context of their use, are not merely descriptive of applicant's services. The marks, when viewed in their entireties, are arbitrary. They do not identify a commodity applicant sells, as the Examining Attorney argues. Furthermore, there is no evidence that others have a need to use these terms in rendering the identified services, as the Examining Attorney argues. We find applicant's long, and apparently exclusive, use of the marks persuasive evidence of the absence of such a need -- for over sixty-five years in the case of the SUGAR NO. 11 and SUGAR NO. 14 marks and one hundred and thirty-five years in the case of the COTTON NO. 2 mark. The record does show that others can and do use the terms/marks to refer to applicant's specific services. This use in no way indicates that the marks are merely descriptive of the identified services.

The Use/Specimen Refusal

Next, we address the issue of the specimens, that is, whether SUGAR NO. 11, SUGAR NO. 14 and COTTON NO. 2, as used on the specimens, function as service marks for "financial services, namely, futures exchange and related commodity trading services."

8

We display the specimens of record below:





Ser. Nos. 78199832, 78199843 and 78199848



Applicant describes its specimens as follows:

> Here, the specimens submitted in support of the Subject Marks are printouts from Applicant's website discussing the trading specifics of SUGAR NO. 11, SUGAR NO. 14 and COTTON NO. 2, such as trading hours, strike prices, listing procedure, ticker symbol and other trading options, which clearly indicate futures exchange and related commodity trading services. The specimens all have the same layout. At the top of the page appears a link to the contract specifications for futures trading associated with the Subject Marks. Below the link is a header that states FUTURES CONTRACT ON SUGAR NO. 11 (WORLD) or FUTURES CONTRACT ON SUGAR NO. 14 (DOMESTIC) or COTTON NO. 2 FUTURES CONTRACT. Below the header appears text describing the exchange and related commodities trading services, such as the daily price limits and position accountability.

Applicant's Main Brief at 13.

The Examining Attorney argues:

10

> A term that is used only to identify a
> product, device or instrument sold or used
> in the performance of a service rather than
> to identify the service itself does not
> function as a service mark. *See In re
> Moody's Investors Service Inc.*, 13 USPQ2d
> 2043 (TTAB 1989) ("Aaa," as used on the
> specimen, found to identify the applicant's
> ratings instead of its rating services).
> Clearly the applicant is using the proposed
> marks SUGAR NO. 11, SUGAR NO. 14 and COTTON
> NO. 2 to identify financial instruments used
> in the performance of the futures exchange
> and related commodity trading services. As
> such, the proposed marks do not function to
> identify the trading services but instead
> are the apt names of the contracts that are
> the subject of those services.

Examining Attorney's Brief at 9.

Applicant argues that its marks do identify the source
of the identified services. To support its argument, in
addition to the specimens, in each of the applications
applicant has submitted copies of the regulations
specifying the terms of the contracts associated with each
of the three marks. Applicant issues these regulations
and, as applicant explains in the quoted language above,
there is a link to a copy of the regulations in each of the
specimens.

Also, applicant has submitted for the record examples
of a number of registrations for other marks which it
argues are similar to the marks at issue here and which
have been registered for similar financial or investment

11

services based on similar specimens of use. In each instance, applicant has also submitted a copy of the relevant specimen. The records include third-party registrations and a copy of Registration No. 2853551 owned by applicant for the mark COFFEE "C" in standard-character form for services identical to those identified in the three applications at issue here. The specimen is likewise identical to the specimens submitted in the three applications at issue here.

Trademark Act Section 1(a) requires that an applicant submit "specimens or facsimiles of the mark as used" as part of the application. 15 U.S.C. § 1051(a)(1). The Act provides further that a mark is "in use in commerce … on services when it is used or displayed in the sale or advertising of the services." 15 U.S.C. § 1127. The Trademark Rules likewise specify, "A service mark specimen must show the mark as actually used in the sale or advertising of the services." 37 C.F.R. § 2.56(b)(2). The Board has observed that use in the "rendition" of services should be viewed as an element of the "sale" of services under Section 45 of the Act. *In re Red Robin Enterprises, Inc.*, 222 USPQ 911, 913 (TTAB 1984). *See also In re Metriplex Inc.*, 23 USPQ2d 1315, 1316 (TTAB 1992); *In*

*re Eagle Fence Rentals, Inc.*, 231 USPQ 228, 230 (TTAB 1986).

Also, the Board has recognized that the service need not be referenced explicitly even in a specimen which purports to show use of a mark in the advertisement or promotion of the services. *See In re International Environmental Corp.*, 230 USPQ 688, 691 (TTAB 1986)(specimen showing use of mark in surveys used to promote service with no mention of "distributorship services" found acceptable). In the case of a specimen intended to show use of the mark in the sale or "rendering" of the service, the specimen need not and often will not include an explicit reference to the service. *In re Metriplex Inc.*, 23 USPQ2d at 1316.

We conclude that the specimens of use, which applicant has submitted in each of the three applications at issue here, are sufficient to show use of the respective marks in connection with the identified services. We conclude so based on our analysis of the specimens themselves, the context of use and the history of applicant's exclusive use in the industry reflected in this record.

In each of the three specimens the primary use of the marks is with the wording "futures contract": "Futures Contract on Sugar No. 11 (World)"; "Futures Contract on Sugar No. 14 (Domestic)"; and "Cotton No. 2 Futures

13

Contract." The Examining Attorney overemphasizes and misconstrues the significance of this wording. More generally, the Examining Attorney fails to give adequate consideration to the full context within which the specimens are used and the services are rendered.

The Examining Attorney bases his rejection of the specimens on the belief that the marks/designations at issue only identify the goods which are the subject of the futures contracts or the futures contracts themselves. The Examining Attorney implies that this use contradicts applicant's claim that the marks/designations identify applicant as the source of the futures exchange services. However, in these cases, SUGAR NO. 11, SUGAR NO. 14 and COTTON NO. 2 not only identify the relevant contracts, contracts which are unique to applicant, but SUGAR NO. 11, SUGAR NO. 14 and COTTON NO. 2 also identify the source of the futures exchange services.

The circumstances present here are different from cases in which the proposed mark is used to identify a product or service which is completely distinct from the goods or services identified in the application. *Cf. In re Bose Corp.*, 546 F.2d 893, 192 USPQ 213, 216 (CCPA 1976) (As used on specimen, SYNCOM only identifies a speaker-testing

14

computer and not the identified goods "loudspeaker systems for high-fidelity music reproduction.").

In the cases we consider here, when we view the full context of the use of the marks, including the "futures contract" wording, we conclude that the inclusion of this wording would not interfere with the perception of the marks as service marks for futures exchange services by relevant consumers. While the marks may also identify the futures contracts, again contracts which, on this record, are unique to applicant, the contracts are an integral and essential component of the identified services, that is, the operation of a futures exchange. *In re Ancor Holdings, LLC*, 79 USPQ2d 1218, 1220-1221 (TTAB 2006).

The contracts embody the intangible rights which are being exchanged when customers use applicant's futures exchange services. Under the circumstances, the connection between the marks and the services is evident and need not be stated explicitly as the Examining Attorney implies. *In re Metriplex Inc.*, 23 USPQ2d at 1316. In fact, when we view the marks at issue here in the full context of the specimens, in each instance the mark would be perceived readily: SUGAR NO. 11 from "Futures Contract on Sugar No. 11 (World)," SUGAR NO. 14 from "Futures Contract on Sugar No. 14 (Domestic)" and COTTON NO. 2 from "Cotton No. 2

15

Futures Contract." Thus, the specimens show use of the marks in the rendering of the services.

The prominent use of the marks in the corresponding regulations further confirms the fact that relevant customers will associate the marks with applicant as the operator of the exchange. *In re Safariland Hunting Corp.*, 24 USPQ2d 1380, 1381 (TTAB 1992). Likewise, the extremely long periods of use of each of the marks by applicant provides further confirmation of this association -- for over sixty-five years in the case of the SUGAR NO. 11 and SUGAR NO. 14 marks and one hundred and thirty-five years in the case of the COTTON NO. 2 mark. Also, as we indicated, the evidence of record shows a consistent, explicit association of SUGAR NO. 11, SUGAR NO. 14 and COTTON NO. 2 with applicant, and no evidence of use of these designations by anyone else.

We decline to rely on applicant's COTTON "C" registration or the third-party registrations applicant made of record. Actions on prior applications do not dictate the result in later cases. *See In re Nett Designs Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001).

The Examining Attorney relies on *In re Moody's Investors Service Inc.*, 13 USPQ2d 2043 (TTAB 1989) to support his position. However, we find the *Moody's*

16

decision distinguishable from the cases under consideration here.  In that case the applicant sought to register "Aaa" for "providing ratings of fixed interest rate obligations." The issue on appeal was whether the specimens showed use of "Aaa" as a service mark for the identified services.  The specimens were publications of the applicant showing use of "Aaa" in ratings of certain securities and explaining its significance as a top rating.  The *Moody's* opinion includes a quote from an article in the record in the case:  "Under present commercial bank regulations issued by the Comptroller of the Currency, bonds rated in the top four gradations by S&P, Moody's, and Fitch - triple-A, double-A, single-A, and triple-B, or Baa - are generally considered eligible for bank investment."  *Id.* at 2947, n.2.  Thus, unlike the cases before us, the record included evidence that the applicant's competitors also used "triple-A" to identify their top rated securities.  In contrast, in the cases before us we have no such evidence.  Rather, the evidence of record indicates not only that applicant is the only party which uses SUGAR NO. 11, SUGAR NO. 14 and COTTON NO. 2 in the operation of a futures exchange, but that applicant has done so for a very long time.  Furthermore, there are significant differences between the services

17

which were at issue in the *Moody's* case and the nature and use of the "Aaa" mark and the marks now before us.

Accordingly, we conclude that the specimens of record show use of SUGAR NO. 11, SUGAR NO. 14 and COTTON NO. 2 as service marks for "financial services, namely, futures exchange and related commodity trading services."

**Decision**: We reverse the refusals to register the marks in each of the three applications both on the ground that the marks are merely descriptive and on the ground that applicant has failed to show use of the marks as service marks.